**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OK KYONG HEDRICK, et al. | * |
| | * |
| Plaintiffs | * |
| v. | * |
| UNITED STATES OF AMERICA | *   Civil Action No.: 1:05CV02070 |
| Defendant | * |

\* \* \* \* \*

**PRE-TRIAL CONFERENCE STATEMENT**

Now comes Plaintiffs, by their attorneys, Stuart M. Salsbury, and Salsbury, Clements, Bekman, Marder & Adkins, L.L.C., and in accordance with the Scheduling Order of this Court, sets forth the following as a Pre-Trial Conference Statement:

**A. Plaintiffs' Statement of Facts**

The Plaintiff, Ok Kyong Hedrick, is a 48 year old (d/b: 9/1/58) woman with a intermittent history of lower back pain which began as a child around 5 years old after a traumatic injury. She was in an orphanage in Korea, and was hit by a wooden leg of a chair by one of the staff which resulted in a back injury requiring her to wear a back brace. She was sent back to the orphanage and after some time was given hospital treatment which demonstrated findings of an infection that required back surgery. Eventually, the lower back pain subsided and the wound healed. However, she was left with a kyphotic deformity of her back. A kyphosis is tilting forward of the spine. The lower back pain was quiescent until she experienced pains during the various pregnancies with her four children. With her first three pregnancies, things went fairly well and her lower back pain was under control. However, during her fourth pregnancy,

her back pain persisted after the birth of her child and she had a worsening of her condition which interfered with her ability to sit, stand and walk for prolonged periods of time. She was finally directed to Bethesda Navy Hospital and then referred to Neurosurgery and finally to Ross Moquin, M.D., a neurosurgeon who was at both Bethesda Navy and Walter Reed Hospitals.

At that time, a CAT scan of the spine showed T12-L2 kyphotic fusion with a marked deformity. Dr. Moquin determined that the patient was an appropriate candidate for correction and alleviation of her back pain and scheduled her for surgery on June 2, 2000 for a correction of her kyphosis scoliosis deformity with a fusion T9-L3.

Under appropriate standards of care, complex spine surgery such as this requires detailed x-rays and an appropriate plan for the procedure. During his deposition, Dr. Moquin was unable to point out in any of the medical records the plan for the surgery he had scheduled. He could not show on any of the documents provided any measurements he had taken as to the angle of the spine deformity commonly referred to as Cobb measurements nor could he show any measurement of the sagittal balance of the deformity of Mrs. Hedrick. Neither could he show in the records or through x-ray films that appropriate x-rays had been taken before the surgery to document the nature and extent of the deformity. The record indicates that on June 2, 2000 Dr. Moquin performed the correction procedure at Walter Reed Army Hospital Center on Mrs. Hedrick. In performing the dissection to reach the spinal areas to be corrected, Dr. Moquin severed the L1 nerve root. This nerve controls, among other things, the hip flexors which stabilize one's ability to walk with a normal gait. According to Dr. Moquin, the surgery was performed in what he termed an extra-cavitary fashion from a posterio-

lateral approach.  In lay terms, this means that he was coming in from the back slightly on the side.  Dr. Moquin indicated that this was an appropriate approach for this procedure and that he could view the entire spine from this posterio-lateral approach even though it was at the lower levels of the spine.

After the surgery, Mrs. Hedrick was in severe pain.  Moreover, instead of correcting the kyphosis, Dr. Moquin left Mrs. Hedrick still in a severe kyphotic posture.  This was complicated more by the avulsion of the L1 nerve root which left Mrs. Hedrick with persistent weakness of the left hip.  Her whole hospitalization was complicated and lasted for several weeks which was followed by additional several months of inpatient rehabilitation.  She continued to do poorly and could not stand up straight and her pain had significantly worsened after her surgery.  Because of the unremitting pain, she had to take large amounts of narcotic pain medication.  She also saw several pain specialist and physical therapists for a period of almost two years.  During this time, Dr. Moquin could not provide her any explanation as to the nature and causes of her severe chronic pain syndrome.

Finally, in April of 2002, she consulted with Khaled Kebaish, M.D., a spine specialist at Johns Hopkins Hospital.  He specializes in reconstruction of severe spine deformities.  At the time she saw Dr. Kebaish she was found to have back pain requiring her to wear a brace full time.  Dr. Kebaish noted that she was significantly stooped over and could not stand up straight.  His examination revealed weakness of her left hip flexors which decrease sensation along the L1 distribution where her nerve had been severed by Dr. Moquin.  Dr. Kebaish took x-rays at that time which showed a fusion from T9-L3 with an anterior fusion from T12-L2 with a cage plate.  He found that there

was evidence of a non-union of the fusion on the x-rays and that she was noted to have a kyphosis and that her sagittal balance (a measurement of her deviation from a normal curvature of the spine) was at least 5 cm anterior to the sacrum which accounted for her hunched over posture. He also determined that there was evidence of loosening around the screws and the cages placed by Dr. Moquin. He saw from the x-rays that Dr. Moquin had fused her in a kyphotic position at the thoraco-lumbar junction. At that time, De. Kebaish obtained radiographs as well as a CT Myelogram which confirmed his diagnosis of pseudoarthrosis. This diagnosis meant that the areas that Dr. Moquin had attempted to fuse did not fuse appropriately and were now after two years serving as pain generators because they were not stable.

  Dr. Kebaish at that time recommended cervical intervention in the form of removal of the cage and refusion anteriorly of the spine as well as correction of the kyphotic deformity through a procedure known as a kyphectomy. Because Mrs. Hedrick had medical coverage through the military, she could not get the surgery approved to be done at Johns Hopkins Hospital by Dr. Kebaish. The military would only approve her going back to her original surgeon, Dr. Moquin.

  She returned to Dr. Moquin who on July 3, 2002 scheduled Mrs. Hedrick for a posterior spinal fusion revision to accomplish a T6-L5 posterior spinal fusion. This meant that he was merely extending the fusion mass. Despite the findings of Dr. Kebaish, which were made available to him, Dr. Moquin did not address in this surgery the primary source of her pain, the pseudoarthrosis (non-union) which Dr. Kebaish had diagnosed and confirmed on x-ray and CT. It is interesting to note that his operative notes indicate that loose screws were found during this procedure which is a

confirmatory indication of pseudoarthoris.  If the bone has fused appropriately, the screws should not come loose.  Moreover, in his operative note he notes on page 3 at the end, "the rods were bent and contoured to accomplish some elimination of her lordotic scoliosis".  It appears from post operative x-rays that the rods were indeed bent and in fact completely eliminated her lordotic curve and left her with a flat back syndrome.  This is a condition that is totally below the standard of care and under no circumstances is acceptable, even according to Dr. Moquin in his deposition.

On July 24, 2002, Dr. Moquin performed a second procedure which he termed "posterior to anterior to posterior revision surgery."  The operative report indicates that during this surgery discectomies were accomplished at L3-4 and L4-5 and there was the placement of interbody cages.  It is interesting to note that during this surgery, he inspected the cage at T12-L2 and determined that no revision was necessary of this, despite the findings by Dr. Kebaish that this was the site of the pseudoarthrosis.

It is interesting to note that despite the fact that Dr. Moquin denied there was a pseudoarthrosis of the lumbar-thoracic fusion in a brief operative note dated July 20, 2002 the pre-operative diagnosis and post operative diagnosis is listed as "pseudoarthoris of lumbar-thoracic fusion" (July 2002 medical records at page 20).

After these operations, the patient's posture had worsened and her pain remained as intractable as before.  She was told by Dr. Moquin that the cage was solid and did not need revision.

She returned to Dr. Kebaish in December of 2002.  At that time, he examined her and noted that she was extremely kyphotic and had a severe compromise of her sagittal balance.  She continued to have severe back pain and was still on large amounts of

narcotic drugs. Dr. Kebaish determined that the original fusion from 2000 had still not healed and was the source of her pain. He proceeded with surgery on her again in February of 2003 and found during that surgery that it was clear she had a non-union of her fusion and a severe kyphotic deformity. She required a kyphectomy of her deformity and the surgery was quite extensive and complicated. The result of Dr. Kebaish's two surgeries to correct her problem is an improvement of her kyphotic deformity as well as her pain. Nevertheless, she still requires to wear a back brace and continues to take narcotics and other drugs. Her left hip weakness has not changed and impairs her gait and ability to walk in a normal fashion.

Dr. Kebaish, who is serving as the Plaintiffs' expert on standard of care as well a treating doctor on the nature and extent of her disabilities, summed up his opinion as follows:

> "In summary, based on a reasonable degree of medical certainty, Ms. Hedrick's original surgery which was done in June 2002 was below the standard of care and was not the appropriate surgery for correction of her original problem. Approaching the spine through a posterior approach and corpectomy anteriorly was not the appropriate procedure at the time. That, obviously, put her at a very high risk of nerve damage which occurred at that time. The second surgery which was performed by the same surgeon in July 2002, again, failed to address the problem of nonunion of her fusion. In addition, she was fused in a kyphotic position, and, interestingly enough, it was clearly indicated in the surgeon's note that the rods were bent and contoured to eliminate lordosis which, again, is below the standard of care.

> Understandably, the patient did poorly following [sic] this. Ms. Hedrick secondary to her surgery has suffered permanent nerve damage, and was fused in a kyphotic position. Her nonunion was not addressed after having had two surgeries necessitating two additional surgeries in order to address this problem. As a result, Ms. Hedricks continues to have a major disability which is permanent."

Plaintiff's second spine surgery expert is Kurht Wieneke, M.D., a spine surgeon with over 35 years of experience having performed more than 4500 spinal surgeries. Dr. Wieneke concurred with Dr. Kebaish that both surgeries performed by Dr. Moquin were below accepted standards of care. Specifically, he found that Dr. Moquin breached the standards of care in the following areas:

1. Failure to create a plan for the first and second surgeries;
2. Wrongful use of a posterior extra-cavitary approach which carried with it an unreasonable risk of injury;
3. Failure to obtain Cobb angles pre and post-operatively as well as sagittal balance measurements;
4. Failure to address the pseudoarthrosis and non-union and failure to repair it during the second surgery;
5. Wrongfully fusing her in a kyphotic position and eliminating her natural lordosis in both the first and second surgeries;
6. Severing the L-1 nerve root;
7. Wrongfully fusing four additional levels unnecessarily.

These failures on the part of Dr. Moquin were explained in greater detail during Dr. Wieneke's deposition. Additionally, Dr. Wieneke found Mrs. Hedrick to have a major disability because of her chronic pain syndrome and the fact that eleven levels of her spine were ultimately fused together by Dr. Moquin, the majority of which were not necessary. Like Dr. Kebaish, Dr. Wieneke found her to be incapable of gainful employment for the rest of her life. He further found that she probably would require pain medication for the rest of her life. Moreover, he opined that there was no surgery or other procedure which could be utilized to correct her problems or eliminate her pain beyond the point that it is now. He determined that her chronic pain syndrome was due to the fact that instead of one surgery, Mrs. Hedrick ultimately had five surgeries which have left her with extensive scarring. He also stated that because of the way Dr. Moquin attempted to correct her problems, he has for all purposes precluded any solution to her pain problems. She has since the first operation been in chronic and intractable pain. Dr. Wieneke further gave an opinion that had the first surgery been done within accepted standards of care, the probability is that Mrs. Hedrick's kyphosis would have been corrected and that she probably would have been pain free.

Plaintiffs also intend to call Charles Smolkin of Smolkin Vocational Services, Inc., who prepared a report on June 27, 2006 of his vocational assessment of Mrs. Hedrick. He indicated that Mrs. Hedrick had a formal education consisting of receiving a bachelor of science degree in theology from Sole Korea Bible Baptist Theology College and also received certification as a nurses aid from Delaware Technical College. Mrs. Hedrick worked as a daycare provider at Bolling Air Force base for nine months in 1999. Previously, she had worked from 1983 to 1992 at the International Language Institute in

Korea teaching English, earning more that $30,000 per year.  She also worked after that at an orphanage in Korea as an assistant director in charge of supervising teachers, performing library work and handling financial resources.  She earned approximately $30,000 per year also for this job.  She left these employments because she came to the United States with her husband.  Mr. Smolkin learned that Mrs. Hedrick had planned to return to her occupation in nursing and become a registered nurse.  He concluded that she would not able to return to any of these professions or "any other job in the work force".

      Thomas C. Borzilleri, Ph.D., an economic consultant has also prepared on behalf of the Plaintiffs reports of the loss of earning capacity sustained by Mrs. Hedrick and a report of the loss of the value of home services arising from the injury of Mrs. Hedrick.  Had Mrs. Hedrick continued on as a nurses aide the present value of her earnings loss would be between $430,840 to $515,505.  The higher estimate assumes continuous employment to age 66.6 while the lower estimate is based on a work life expectancy of 62.7 years.  Further, Dr. Borzilleri concluded that had Mrs. Hedrick completed nursing school and become a registered nurse, her earning losses would be between $1,096,327 to $1,311,766, again depending age of retirement.  In calculating the loss of value of home services due to her injuries, Dr. Borzilleri estimated the approximate current market costs to replace the home services Mrs. Hedrick would have provided for the benefit of herself and her family had she not been injured.  Based on information from the Bureau of Labor Statistics and other sources, Dr. Borzilleri estimated these losses to be $329,927.  With an adjustment for slightly higher Maryland wages, these losses would be $329,723.

Additionally, there is a claim for the pain and suffering Mrs. Hedrick has endured in the past and will endure in the future as a result of her chronic pain syndrome and eleven level fusion. Essentially, based on the history given by her and the information provided by her doctors, she cannot comfortably sit, stand or lie down for any long periods of time. While her kyphosis has been corrected to some degree, that correction was limited because of the problems resulting from Dr. Moquin's previous surgeries. Prior to the disabilities caused by these various surgeries, Mrs. Hedrick had been an active, loving wife, mother and housekeeper. She participated in numerous activities with her children, was socially active with her husband and carried on a fulfilling sexual relationship with him. After her fourth pregnancy, she did develop problems in her back due to her kyphosis. Had her kyphosis been corrected under appropriate standards of care, it is likely that she would have been functional and pain free after the surgery. She now is unable to participate in activities with her children, is unable to go out socially, is unable to shop for her family, is unable to cook for her family and is unable to have a meaningful, intimate relationship with her husband. Since her first operation with Dr. Moquin in July of 2000, she has had virtually intractable pain for almost seven years. It is likely that she will continue having this intractable pain for the remainder of her life. It will effectively preclude her from participating in all of her normal daily activities which she previously enjoyed. Moreover, the laceration of her L-1 nerve root has affected her gait and her ability to walk in a normal fashion. She now requires assistance for bathing, showering and dressing, has to use a wheelchair since she cannot walk for any distance and to give some relief from pain she is required to take Methadone and Neurotin or a daily basis. Previously, she was on high doses of narcotic

medication but to prevent addiction was switched to Methadone. She suffers the affects of these medication which have included in the past withdrawal and constipation. She experiences numbness in her abdominal area, thighs and legs and can longer have intercourse with her husband. In essence, where she previously was the caretaker of her family, she is now the one who has to be cared for by her family. Her life has been reduced to a mere existence where she tries to cope on a daily basis. At age 48, she now has a life expectancy of 34.2 years.

      Finally, Mr. Hedrick had filed a claim for loss of consortium which under the circumstances in the instant case is a significant claim. Because of Mrs. Hedrick's chronic pain, loss of feeling in her pelvic area and her loss of flexibility and ongoing back sequelae, she has not been able to have intercourse with her husband and will not be able to in the future. Moreover, the entire Hedrick family situation has been altered to where Mrs. Hedrick's care is now the main focus of family life. Her daughter has had to miss semesters of college to care fo her mother. Mr. Hedrick has had to assume the household duties she used to perform and social life outside of the home has come to a virtual halt.

**B.  Undisputed issues and facts**

      1.      Authenticity and genuineness of Ok Kyong Hedrick's medical records, bills and radiological films.

**C.  Disputed issues**

      1.      Breach of the standard of care

      2.      Causation

      3.      Damages

    4.    Need for medical care related to the alleged negligence

**D. Relief Sought**

| | | |
|---|---|---|
| 1. | Non-economic damages | $2,500,000.00 |
| 2. | Medical Expenses | $   75,000.00 |
| 3. | Lost wages | $430,840-$1,311,766 |
| 4. | Loss of household service | $  329,723.00 |
| 5. | Loss of Consortium | $  750,000.00 |

**E. Counter Claims, Cross Claim, Third Party Claim:**

None.

**F. Amendments Required of The Pleadings:**

None.

**G. Issues in The Pleadings to be Abandoned:**

None.

**H. Stipulations of Facts/Requested Stipulations of Fact:**

Plaintiffs request the following stipulations by the United States of America:

    1.    That Ross Moquin, M.D. at all relevant times was an agent of the Defendant, United States of America.

    2.    That the Defendant, United States of America, has been unable to locate x-rays or other radiological studies of the Plaintiff prior to the surgery of June 2, 2002.

**I. Plaintiffs' Exhibits:**

    1.    Medical Records of Ok Kyong Hedrick (blow ups of selected records)

    2.    Medical Bills of Ok Kyong Hedrick

    3.    Report of Khaled M. Kebaish, M.D.

    4.    Report of Kuhrt Weineke, Jr., M.D.

    5.    X-Rays of Ok Kyong Hedrick

    6.    Loss of Earnings and/or Earning Capacity Report

    7.    Loss of Value of Home Services Report

    8.    Vocational Report

    9.    Medical Literature

    10.    Curriculum Vitae of various Experts

    11.    Power Point - X-Rays and Spine

    12.    Photographs

**J. Non-Expert Witnesses:**

    1.    Ok K. Hedrick

    2.    John Hedrick

**K. Expert Witnesses:**

    1.    Khaled M. Kebaish, M.D.   (Spine Surgery)
           601 N. Caroline Street
           Suite 5244
           Baltimore, Maryland 21287

    2.    Kuhrt Wieneke, Jr., M.D.   (Spine Surgery)
           900 State Road
           North Adams, MA 01247

    3.    Charles Smolkin             (Vocational Assessment)
           Smolkin Vocational Services, Inc.
           8 Church Lane
           Baltimore, MD 21208

    4.    Thomas C. Borzilleri, Ph.D. (Economist)
           One Democracy Plaza

>6701 Democracy Blvd., #300
>Bethesda, MD  20817

**L. Portions of Depositions to be Offered in Party's case in Chief:**

>For the Plaintiffs:

>The Plaintiff reserves the right to use deposition testimony of Ross Moquin, M.D.

**M. Demonstrative or physical evidence**

>1. Plaintiff may enlarge portions of medical records.

>2. Plaintiff may use diagrams of the anatomy of the spine.

>3, Plaintiff may use power point of records, x-rays and/or photographs.

>4. Plaintiff may use models of the spine.

**N. Videotapes**

>For the Plaintiffs:

>De Bene Esse Deposition of Khaled M. Kebaish, M.D.

**O. Settlement**

>Settlement discussions are ongoing.

**P. Estimated Length of Trial**

>4-5 days

_____
STUART M. SALSBURY Fed. Bar #463059
SALSBURY, CLEMENTS, BEKMAN,
　　MARDER & ADKINS, L.L.C.
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
410-539-6633

Attorneys for the Plaintiffs