IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OK KUONG HEDRICK, et. al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action Number: 05-2070 (JR) |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S PRETRIAL STATEMENT

Pursuant to this Court's Pretrial Scheduling Order, Defendant hereby files this Pretrial Statement. Plaintiff filed a separate Pretrial Statement on March 16, 2007.

## I.    INFORMATION REQUIRED BY LOCAL RULE 16.5(b)

### 1. Defendant's Statement of the Case

Mrs. Hedrick's preexisting injuries

1.    Prior to her first surgery at Walter Reed Army Medical Center ("WRAMC"), Mrs. Ok K. Hedrick reported she had back pain "for as long as she could remember." Her medical records reflect a long history of spinal deformity and low back pain, as well as the poignant story of her childhood as an orphan in Korea. She was born in 1958. Her mother died of tuberculosis when she was eight days old. She also had numerous other relatives who died of tuberculosis. She was raised in a Korean orphanage where she suffered malnutrition and severe beating from older children. At age five, she was beaten with a desk leg and developed severe back pain and could not stand. After about a week, she developed a draining sinus and was eventually taken to a physician and put into a body cast. In around fifth or sixth grade, she was moved to a different orphanage where she was found to have a severely deformed spine. She apparently suffered a

lumbar vertebral fracture in her back from being beaten at the orphanage.  She was taken to a

hospital and had a fusion of her lumbar vertebrae.  She had an abnormal back and low back pain

since that time.  She was left neurologically intact but with significant spinal deformity.  In

addition, her left leg has been longer than her right leg since this surgery.  She developed severe

low back pain after becoming pregnant.  She was diagnosed with Pott's disease and was treated

for over a year with four drugs.[1]  Her Pott's disease was pronounced cured.  She later tested

positive, however for tuberculosis and was treated again in 1993-94, after her entry into the

United States.

2.  Mrs. Hedrick's pregnancies in 1982 and 1983 exacerbated her low back pain, and she

underwent a bilateral tubal ligation in 1983.  From 1982 through 1995 she had a persistent,

chronic low back pain.

3.  In 1993, she was seen at Dover Air Force Base, Delaware, for a complaint of right and

left side muscle spasms or tightness.  X-rays indicated scoliosis in the thoracic and lumbar spine,

and kyphosis at the thoracolumbar junction.

4.  In 1995, Mrs. Hedrick underwent reversal of the bilateral tubal ligation.  She had

another pregnancy in 1996 with worsening low back pain as before.  Her low back pain was then

stable until 1999 when, with her fourth pregnancy, it again worsened.   She gave birth to her

fourth child in June 1999.

5.  On September 23, 1999, Mrs. Hedrick was seen by Dr. Matthew Radimer at the

National Naval Medical Center (NNMC) Orthopedics Service for a complaint of left-sided lower

back and hip pain that was exacerbated by lifting, sitting, standing or walking.  She described the

pain as sharp, beginning in the back and radiating down the left hip.  It was alleviated by lying

---

[1] Pott's disease is tuberculosis of the spine.

2

flat on hard ground and by heat.  The pain was progressively worse since the birth of her child three months earlier.  She also complained of diffuse right sided pain.  Dr. Radimer ordered a bone scan to rule out acute fracture or active infection, referred the patient to Infectious Diseases for evaluation of tuberculosis, ordered a heel lift for her leg length discrepancy (right leg was longer than left), ordered a CT scan of her lumbar spine to evaluate for fusion from L1-L4, and ordered labs and instructed her to follow up in 4-6 weeks.

6. On 18 October 1999, Mrs. Hedrick was seen by Dr. Rusty Brand, NNMC Orthopedics. Dr. Brand recorded the results of the September 29 CT scan, which indicated the L1, L2 vertebral bodies were wedged in a gibbus deformity.[2]  His plan was to consult Neurosurgery to discuss options, and consider fusion.   This resulted in Mrs. Hedrick's referral to WRAMC Neurosurgery and Dr. Ross Moquin.

Beginning of Treatment by Dr. Moquin

7. On December 15, 1999, Mrs. Hedrick had her first outpatient visit with Dr. Moquin at WRAMC Neurosurgery.  He noted her long history of back and leg pain, and that she had treatment for tuberculosis as a child.  She told Dr. Moquin she had significant pain with any movement and a sense of weakness in her legs.  He noted that a CT scan showed T12-L2 kyphotic fusion with marked deformity.  He assessed a kyphotic deformity at L1-2.  His plan was to consider her for surgery.

8. On 17 May 2000, Mrs. Hedrick met with Dr. Moquin to discuss the risks, benefits and alternatives to spinal surgery and executed a consent form for the surgery.

9. Mrs. Hedrick was admitted to WRAMC on June 2, 2000.  She reported worsening low

---

[2] Gibbus, or gibbous, is defined as "extreme kyphosis, hump, or hunch; a deformity of the spine in which there is a sharply angulated segment, the apex of the angle being posterior."  Stedmans Medical Dictionary (27th Ed.) p. 741.

back pain over past ten months; especially over the past five months.  The pain was exacerbated by long standing or sitting, and was only relieved by lying down.  Mr. Hedrick stated this became so frequent that Mrs. Hedrick had to lay down at the shopping mall on occasion.  Mrs. Hedrick admitted to occasional radiating pain down her left leg, however, her pain was 98% low back pain and 2% left leg radiating pain.  Over the week prior to surgery she reported having left lateral thigh numbness.  She had intermittent weakness in her left leg also, but not to the point of affecting her gait.

The June 2, 2000 surgery

10.  On June 2, 2000, Dr. Moquin performed the surgery, identified as kyphosis scoliosis deformity correction with fusion T9 through L3 and placement of a cage anteriorly.  For the surgery, Mrs. Hedrick was placed on the operating table in the prone position to facilitate a posterior surgical approach.  Her back was opened and her spine was exposed.  Significant kyphotic and scoliotic deformity was noted.  The spinal cord was seen to be under significant pressure.  Because of the deformity of her anatomy, the L1 nerve root was not in an expected anatomic position and was lost in the dense tissue of the fascia.  This resulted in it being inadvertently cut.

11.  After the posterior decompression was accomplished, there was still pressure on the thecal sac.[3]  Due to the high kyphotic deformity, it was felt that the anterior compression could be performed in an extracavitary fashion.  For this reason, the T12 rib was further exposed and a portion of it was removed.  The vertebra at T12, L1 and L2 were then completely removed, leaving only the spinal cord.  The spinal cord was now free from pressure.  The spine then had to be fused.  Dr. Moquin installed a titanium mesh cage in the place of the removed vertebra.  The

---

[3] The thecal sac is a protective membrane that covers the spinal cord

cage was filled with bone graft from a cadaver to form the fusion of the spine at the T12-L2 levels. Further spinal fusion was performed by placing pedicle screws at several levels above and below the cage.

12. Mrs. Hedrick received intensive physical and occupational therapy during her rehabilitation. She made excellent progress in therapy. Upon discharge, she was able to walk using a cane and a rolling walker. She was given pain medications to control her pain. She returned for follow-up visits with Dr. Moquin regularly over the next two years.

13. Mrs. Hedrick was evaluated at Dover Air Force Base in early 2002 and complained of chronic back pain. She requested to be seen at Johns Hopkins University Hospital and her request was approved. In April 2002, Mrs. Hedrick visited Dr. Khaled Kebaish at Johns Hopkins for an initial assessment of her continued pain following her June 2002 surgery. She told Dr. Kebaish that she continued to have severe pain and had numbness in her left thigh. Dr. Kebaish's assessment stated: "The patient has possible nonunion of her fusion with pseudoarthrosis.[4] She also has weakness related to nerve damage at L1 as indicated by the operative note from her prior surgery. She certainly has some compromise of her sagittal balance as well...."

14. On April 18, 2002, Mrs. Hedrick saw Dr. Kebaish for a followed-up appointment. His assessment was: "Pseudoarthrosis s/p multiple level corpectomy and fusion. She also has flat back and disabling back pain. Discussed findings and options. Surgical option would involve exploration of the fusion from an anterior approach and removal of the cage and refusion

---

[4] *Nonunion* indicates failure of the fragments of a fractured bone to heal or to obtain bony fusion following the fusion of bones across a joint space. *Pseudoarthrosis* is a form of nonunion in which there is the formation of a false joint with some cartilage covering the ends of the bones and a cavity containing fluid that resembles a normal joint.

in case there is no evidence of fusion, and I suspect that will be the case. Regarding her flat

back, that may be corrected, but that may require a front and back surgery to remove her

posterior instrumentation. This obviously would be an extensive surgery....at the present time

she is not sure which way she wants to go, but she will let me know if she decides to go ahead.

Otherwise, she will continue wearing her brace and using medication to control the pain."

15. On June 25, 2002, Mrs. Hedrick returned to see Dr. Moquin at WRAMC. He noted

that the plan for surgery at Johns Hopkins "was for an anterior and posterior revision. This is

based on loosening about the cage and 2 of the loose screws posteriorly. I believe that this is a

reasonable course of action." Dr. Moquin stated that he offered to do the surgery himself, and

had her also talk to another WRAMC spine surgeon, Dr. Timothy Kuklo. Dr. Moquin also

discussed the case with Dr. Kuklo.

16. On July 2, 2002, Dr. Moquin met with Mr. and Mrs. Hedrick to discuss the surgery.

His note records the findings of radiology studies: "plain films moderate fusion mass with

hardware in good position and intact. There is haloing about the cage anteriorly and two of the

posterior screws reveal evidence of haloing as well. There is no compression on the thecal sac

or the nerve roots on the post myelogram CT scan." He recorded his impression as:

"pseudoarthrosis anterior and posterior after kyphosis correction surgery." Under 'Plan,' he

noted, "I have offered revision surgery to include anterior and posterior release. Most likely will

need to replace the anterior cage with a larger and longer one. Will include at least one more

level inferiorly (to L4) and several levels superiorly. This will hopefully reduce the kyphosis

even more. The nature of the surgery has been described in detail using models and radiographic

examples. The risks have been described in detail. The patient has had ample opportunity to ask

questions and all of their questions have been answered. There is significant possibility that the

procedure will need to be staged. Due to the revision nature and the presence of scarring, there is a real risk for further nerve root injury. They are aware that there is also a chance that the surgery will not be successful in relieving all of the pain symptoms. This will be a long and difficult surgery to include significant blood loss and ICU admission. The patient has requested the procedure be performed." Mrs. Hedrick signed a consent form.

The July 3, 2002 Operation

17  With Mrs. Hedrick in the prone position, Dr. Moquin reopened her previous incision to inspect all the screws placed at the prior surgery, and replaced and redirected any screws that were found to be loose. He replaced the old instrumentation with current mobile headed screws. He then extended the fusion from T9 up to T6 and down to L5 with pedicle screws. This required removal of part of a rib in order to visualize the trajectory of the screws. Because of "exuberant scar tissue" around the cage, Dr. Moquin decided that he would have to inspect the cage from a different approach. This meant another surgery would be necessary. No further attempt was made to access the cage via the posterior approach. Attention was then turned to accomplishment of rod placement. Bending and contouring the rods accomplished some deformity correction. Finally, a bone graft fusion mass was placed across the hardware both laterally and posteriorly. Both hip harvest graft taken from the patient's left hip and some bone-bank bone was used.

18  On July 23, 2002, Dr. Moquin obtained Mrs. Hedrick's consent for the second stage of the procedure, a back-front-back T8-L5 spinal revision. Dr. Moquin described the procedure to Mrs. Hedrick as well as the multiple risks of surgery, including but not limited to infection, hemorrhage, pneumothorax, chylothorax, damage to great vessels, nerve root or spinal cord injury, chest tube placement, increased post-operative pain, and death. Mrs. Hedrick understood

7

all the risks and she adamantly wished to proceed with the planned revision.

The July 24, 2002 Operation

19. With the patient in the prone position, Dr. Moquin revised the screws. The vascular surgeons rotated Mrs. Hedrick into a right lateral position to permit access to her spine anteriorly. Attention was then turned to inspecting the anterior cage, which had been placed approximately two years prior at the level of T12 to L2. Dr. Moquin grabbed the cage with a Kocher clamp and vigorously moved it to see if there was any movement of the implant. This included literally lifting the patient off the table by the implant. The cage proved to be stable despite this testing. Dr. Moquin's note stated that "[t]he cage was seen to be a solid, bony fusion." He made the judgment that it was more prudent to leave the cage in place despite the haloing seen on radiographs than to subject the patient to the risks involved in removing it and installing a replacement. He then applied bone morphogenetic protein (BMP) to reinforce the implant.

20. Mrs. Hedrick remained in the hospital until August 9, 2002. Post-operative radiographic imaging for the remainder of her hospital stay found no evidence of hardware complications. On August 8, 2002, she was able to climb stairs and was cleared by Physical Therapy for discharge.

Evaluation and Surgery at Johns Hopkins with Dr. Kebaish

21. On December 19, 2002, Mrs. Hedrick visited Dr. Kebaish. Dr. Kebaish's physical exam indicated that Mrs. Hedrick walked with severe difficulty and was stooped over. His assessment stated that she had, "severe flat back deformity, which has worsened since her last surgery. The pseudoarthrosis at the prior cage placement at T12-L2, has not been addressed."

22. On February 17, 2003, Mrs. Hedrick underwent the first stage of her revision surgery

by Dr. Kebaish. Her preoperative diagnosis was "psuedoarthrosis thoracolumbar spine" and "Kyphoscoliosis." On February 24, 2003, Mrs. Hedrick underwent the second stage of her operation. The combined procedure resulted in removal of the cage implanted by Dr. Moquin in 2000, installation of new hardware and bone graft, and increased fusion of Mrs. Hedrick's spine.

### 2. <u>Statement of Claims</u>

Defendant asserts no claims against Plaintiff.

### 3. <u>Statement of Defenses</u>

<u>Defendant did not breach the standard of care and denies that any alleged breach of care caused Plaintiff's injuries.</u>

To prevail in her medical malpractice claims, Plaintiff must establish through expert testimony: (1) the applicable standard of care owed to the patient; (2) Defendant's violation of that standard; and (3) a causal relationship between that violation and the plaintiff's harm. <u>Ornoff v. Kuhn and Kogan Chartered</u>, 549 A.2d 728 (D.C. 1988). <u>Sponaugle v. Pre-Term, Inc.</u>, 411 A.2d 366 (D.C. 1980). The conduct of a negligence lawsuit defendant is usually measured against the conduct of a hypothetical reasonably prudent person acting under the same or similar circumstances. <u>Morrison v. MacNamara</u>, 407 A.2d 555 (D.C. 1979). In medical malpractice, the duty of care is generally formulated as that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances. <u>Id</u>. at 561. District of Columbia courts determine the applicable duty by looking to the national standard of care, at least when the alleged negligence involves board-certified physicians, hospitals, medical laboratories, and other health care providers. <u>Id</u>. at 565.

Dr. Moquin's decision to use of the extracavitary approach during the 2000 surgery was appropriate. The surgery was well conceived and appropriately planned. The severing of Mrs.

9

Hedrick's L1 nerve was inadvertent and occurred due to the severe distortion of her anatomy, which caused her L1 nerve root to be in a different anatomic position than could be expected. Nerve injury was an inherent risk of the procedure that Dr. Moquin discussed with Mrs. Hedrick preoperatively.

Dr. Moquin appropriately addressed the suspected pseudoarthrosis at the July 2002 surgeries. Any loose screws were replaced and redirected during the July 3 surgery. He addressed the pseudoarthrosis of the titanium mesh cage at T12-L2 when he inspected it during the 24 July surgery. He tested the cage for movement by grabbing it with a Kocher clamp and moving it vigorously to see if the implant moved. He moved it with enough force to lift the patient off the operating table, and the implant did not move. In his judgment, the implant looked good enough that it did not justify removal and replacement and the attendant risks to Mrs. Hedrick from removal and replacement. He revised the T12-L2 fusion by removing as much scar tissue as possible and reinforcing the cage with BMP, a product that promotes bone growth. Dr. Moquin did not fuse Mrs. Hendrick's lumbar spine in a kyphotic position during the 20002 surgeries. Post-surgery x-rays illustrate that Dr. Moquin's 2002 surgeries achieved acceptable results.

Plaintiff is required to prove "a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries." Grant v. American National Red Cross, 745 A.2d 316, 319 (D.C. 2000). Mrs. Hedrick had a significant spinal deformity and low back pain before she came to WRAMC for treatment. The spinal surgery she underwent in Korea in sixth grade had fused her spine in kyphosis. Under District of Columbia law, if the Defendant's negligence proximately caused the aggravation of the plaintiff's prior injury or other health condition, then the plaintiff is entitled to receive damages to the extent that

the prior condition has been aggravated. The plaintiff is not entitled to receive damages for the prior condition itself.

Insofar as Mrs. Hedrick's medical expenses at Johns Hopkins were covered by the military health care system, because she is a dependant of a military retiree, she may not recover for them. Also, increased civilian medical expenses, such as out of pocket expenses not covered by the military health care system, that resulted from a decision to no longer use military facilities because of malpractice are not proximately caused by the malpractice and would not be recoverable. Since Dr. Moquin offered Mrs. Hedrick revision surgery in January 2003, and she chose to have her surgery and all her follow-up care at Johns Hopkins instead, any increased medical expenses resulting from this choice would not be recoverable. See Blanton v. United States, 428 F.Supp. 360, 363 (D.D.C. 1977).

<u>Plaintiffs have not exhausted the administrative remedy with respect to Count II</u>

The FTCA grants a limited waiver of sovereign immunity and allows tort claims against the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Section 2675(a) limits the waiver of federal sovereign immunity by providing that "an action shall not be instituted" under the FTCA "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing ..." 28 U.S.C. 2675(a).

Plaintiffs have not exhausted this administrative remedy with respect to Count II of the complaint, which demands $240,000.00 for loss of consortium. At the time it was presented to the agency, Plaintiff's claim form demanded $3,540,000.000. In response to Defendant's request for clarification of the amount that Plaintiff was claiming for loss of consortium, Plaintiffs' attorney advised:

11

> Of the total amount previously claimed for non-economic damages as part of Mrs. Hedrick's claims, we can specify that Mr. Hedrick and Mrs. Hedrick together seek $150,000.00 for loss of consortium.

See Letter from Sarah Brannon dated September 28, 2004.

The implementing regulations provide that a claim "may be amended by the claimant at any time prior to final agency action or prior to the exercise of the claimant's option [to file suit] under 28 U.S.C. 2675(a)."  Any amendment of a pending claim, however, affords the agency "six months in which to make a final disposition of the claim as amended and the claimant's option under 28 U.S.C. 2675(a) shall not accrue until six months after the filing of an amendment." 28 C.F.R. 14.2(c).  Plaintiffs did not amend their claim to increase the amount demanded for loss of consortium prior to filing suit.  Nevertheless, Count II of the complaint clearly demands a sum for loss of consortium in excess of the amount specified in the administrative claim, as clarified by the letter from Plaintiffs attorney.  Consequently, Plaintiff's claim for loss of consortium has not been exhausted.

Further, even assuming the claim for loss of consortium was properly exhausted, the amount claimed in Plaintiff's Pretrial Brief ($750,000.00) is an amount greater than the $150,000.00 stated in Plaintiff's September 28, 2004 letter.  Any recovery for loss of consortium must be limited to no more than $150,000.00.

### 4.  Witness Schedule

Witnesses Defendant Will Call:

1.   Dr. Ross Moquin
     902 Kimry Moor Rd.
     Fayetteville, New York 13066
     Direct examination expected to be approximately 3 hours.

2.   Dr. Bruce Ammerman (expert, spine surgery)
     3301 New Mexico Ave, N.W.

Washington, D.C.
Direct examination expected to be approximately 1 hour.

3.      Michael A. Conte, Ph.D. (expert, economist)
        Baltimore, Maryland
        Direct examination expected to be approximately 1 hour.

<u>Witnesses Defendant May Call</u>:

4.      Dr. Richard Gullick
        Brooke Army Medical Center
        3851 Roger Brooke Drive
        Fort Sam Houston, Texas
        Direct examination expected to be approximately 1 hour.

5.      Ms. Patricia Knapp
        Walter Reed Army Medical Center
        6900 Georgia Ave, N.W.
        Washington, D.C.
        Direct examination expected to be approximately 1 hour.

5.      Mrs. Ok K. Hedrick

6.      Mr. John Hedrick

## 5.  **List of Exhibits to be Offered in Evidence**

<u>Defendant expects to offer the following exhibits into evidence</u>:

1.      Medical Records of Mrs. Ok K. Hedrick, including x-rays

2.      Curriculum Vitae of Experts

3.      Expert Report of Dr. Bruce Ammerman

4.      Expert Report of Michael A. Conte, Ph.D.

5.      Plaintiff's Administrative Claim forms and letters.

## 6.  **Designation of Depositions**

Defendant reserve the right to introduce deposition testimony for purposes of

impeachment, or in the event that a witness is unavailable.

### 7.  Itemization of Damages the Party Seeks to Recover

Defendant seeks no damages from Plaintiff

### 8.  Request for Other Relief Sought by the Party

Defendant seeks no relief from Plaintiff.

## II.    UNDISPUTED, STIPULATED FACTS

The parties have not yet stipulated to any facts.  To the extent that the parties do so, the parties will present those facts to the Court prior to trial.

## III.    ESTIMATE OF TRIAL TIME

Defendant estimates that the trial should last three to four days.

## IV.    SETTLEMENT NEGOTIATIONS

A settlement conference was held on March 14, 2007, and settlement negotiations were unsuccessful.

## V.    MOTIONS TO BE DECIDED BEFORE OR AT TRIAL

There are no motions pending before the Court.

Respectfully submitted,


_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS D.C. Bar No.  434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant U.S.  Attorney

555 Fourth Street, N.W.,
Washington, D.C.  20530
(202) 353-9895