```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


OK KYONG HEDRICK, et al.,          :
                                   :
          Plaintiffs,              :
                                   :
     v.                            :  Civil Action No. 05-2070 (JR)
                                   :
U.S.A., et al.,                    :
                                   :
          Defendants.              :
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER FOR THE ENTRY OF JUDGMENT FOR PLAINTIFFS**

After a three-day bench trial in which plaintiffs presented their claims for damages caused by unsuccessful back surgery at Walter Reed Army Hospital, the Court makes the following findings of fact and reaches the following conclusions of law:

**Findings of Fact**

Plaintiff Ok Kyong Hedrick was born in Korea in 1958 and raised in Korean orphanages.  She was severely beaten in one of those orphanages when she was a child of 5 and suffered a back injury for which no treatment was provided.  At some later point she contracted spinal tuberculosis, known as Potts Disease, and, at age 11 or 12, she underwent a surgical procedure that left her spine in kyphosis.  As she matured, she had both scoliosis and kyphosis, but with very little pain and no restriction on her movement.  She married in Korea, bore two children, and divorced.

She was remarried, to plaintiff John Hedrick, a U.S. Air Force enlisted man (now retired), and bore two more children.

At the end of her fourth pregnancy in 1999, and thereafter, plaintiff[1] experienced severe back pain.  She went to a military neurosurgeon at Bethesda Naval Hospital, who diagnosed a fixed kypho-scoliotic spinal deformity and offered corrective surgery.

On June 2, 2000, plaintiff underwent surgery at Walter Reed Army Hospital.  A three level vertebrectomy was performed at T12, L1 and L2, employing the extra-cavitary approach.  A titanium mesh cage was inserted anteriorly, and screws were placed above and below the cage, from T9 through L3.  As the surgeon bisected tissue to approach the spine, he inadvertently severed the L1 nerve root, which was not in an expected position and could not be seen in the scar tissue that resulted from the Potts Disease and from the "Hong Kong procedure" plaintiff had undergone at age 11 or 12.

By all accounts, the June 2000 surgery was unsuccessful.  The patient made a number of return visits to Walter Reed but continued to suffer severe, intractable back pain.  In April 2002, she was evaluated by an orthopedic spine surgeon at Johns Hopkins University Hospital, who diagnosed a

---

[1] From this point forward, unless otherwise indicated, "plaintiff" means plaintiff Ok Kyong Hedrick.

possible non-union of her fusion with pseudo-arthrosis, weakness related to nerve damage at L1, and compromise of her sagittal balance.

The surgery offered by the Johns Hopkins surgeon would explore the fusion from an anterior approach, remove the cage "in case there is no evidence of fusion, and I suspect that will be the case," and refuse the spine. As for the "flat back" that compromised the plaintiff's sagittal balance, the Johns Hopkins surgeon noted that "that may be corrected, but that may require a front and back surgery to remove her posterior instrumentation."

The Hedricks' military insurance would not pay for surgery at Hopkins, and so plaintiff returned to Walter Reed, where the surgeon agreed with the Hopkins' surgery plan, noting "haloing about the cage anteriorly and two of the posterior screws reveal evidence of haloing as well." The surgical plan was for "revision surgery to include anterior and posterior release. Most likely will need to replace the anterior cage with a larger and longer one. Will include at least one more level inferiorly (to L4) and several levels superiorly. This will hopefully reduce the kyphosis even more."

The corrective surgery had to be done in two stages, because it would be necessary to access the patient's spine both anteriorly and posteriorly, and because this time the extra-cavitary approach was not indicated. On July 3, 2002, the Walter

Reed surgeon reopened the patient's previous incision, replaced and redirected screws found to be loose, extended the fusion from T9 up to T6 and down to L5, and bent and contoured rods. No attempt was made to access the cage in this first stage. On July 24, 2002, the second stage of the procedure was performed, a "back-front-back T8-L5 spinal revision." It is undisputed that these procedures were unsuccessful; that, following the normal period of recovery, x-rays demonstrated a "falling off" and loss of the lumbar lordosis, caused by failure of the cage implant and failure of the native bone -- conditions consistent with the presence of pseudo-arthrosis; and that plaintiff's intractable pain continued.

There is a substantial factual dispute in the record as to the reason or reasons for the failure of the 2002 surgeries, and that dispute lies at the center of this case. The surgeon's testimony was that, in the second stage operation, he inspected the anterior cage that had been placed approximately two years earlier to determine whether in fact pseudo-arthrosis was present; that he grabbed the cage with a Kocher clamp and vigorously moved it to see if there was any movement of the implant; that the force he employed literally lifted the patient off the table; that he saw no motion; and that he made the judgment that it was more prudent to leave the cage in place despite the haloing seen on radiographs than to subject the

patient to the risks involved in removing it and installing a replacement.  His testimony is that he freshened up the graft at both ends and applied bone morphogenic protein (BMP).  The surgical note for the operation (dictated by an assisting surgeon) made no mention of the use of a Kocher clamp, however, or of lifting the patient off the table, or of manipulating the cage in any way.  It stated only that "the cage was seen to be a solid, bony fusion."  The only other testifying witness who actually saw the cage was the Johns Hopkins surgeon who did corrective surgery seven months later, in February 2003.  In his trial testimony (presented videographically by de bene esse deposition) the Johns Hopkins' surgeon testified that, after the first phase of his two-phase surgery in 2003, "[T]he cage is still there.  I haven't removed it.  You can actually here clearly see the lucency around the cage.  In fact, we were able to correct the spine. . .  And what happened, you can see that <u>we were able to move the position of the cage</u>, which to me is clear evidence of the bone not healing, or not having healed at that time."  Ptfs.' Ex. 23 at 75 (emphasis added).  In the second phase of his operation, he was able to find the pseudo-arthrosis "easily"; it "was not subtle but obvious."  <u>Id.</u> at 121.  His operative notes state:

> "As we approached the diaphragm, we had to
> reflect the diaphragm up which was scarred
> down onto the spine.  There were segmental
> vessels that had not been taken down before

>     from T12 down to L3, and these were
>     identified and taken down and transected.
>     The cage was not visible, and it did not look
>     like it had been exposed previously in this
>     level, <u>as there was obviously still the shell
>     of bone covering the area from T12 down to
>     L3.  So I could not see the cage until I had
>     to remove that bone from T12 to L3.</u>  The cage
>     was obviously present there, and there was
>     obvious evidence of pseudo-arthrosis
>     extending at the junction between at [sic] L3
>     and also proximately, although the cage
>     proximately has dug into the end plate into
>     T11 and was attached all around by fibrous
>     tissue with <u>no evidence of bony healing
>     anywhere at all</u>. . .  The cage was finally
>     removed, and pictures were taken, showing
>     fibrous tissue around the cage proximately
>     and distally and all around it, with no
>     single area of bony healing."

Ptfs'. Ex. 6, at 2.   (Emphasis added.)

The preponderance of the evidence favors the finding, which I hereby make, that the surgery performed at Walter Reed in July 2002 failed properly to identify or correct the pseudo-arthrosis that was known or should have been known to be present at the cage.

The corrective surgery done in two phases at Johns Hopkins in 2003 was characterized as "salvage surgery."  In the first phase, posterior segmental instrumentation was removed, a kyphectomy was performed at T10, and posterior fusion was accomplished from T6 to L5.  In the second phase, the titanium cage was removed and anterior fusion was performed from T11 to L3.  While significant improvement in the patient's sagittal

imbalance was achieved, her pain was not relieved.  It continued -- and continues -- to be intractable and disabling.

It is more likely than not that, had pseudo-arthrosis been properly identified and repaired during the second round of surgery at Walter Reed Hospital, the "falling off" experienced thereafter would not have occurred, or would not have occurred so dramatically; the third round of "salvage" surgery at Johns Hopkins would not have been necessary; and plaintiff's pain would have been significantly reduced if not eliminated.

Plaintiff today is disabled by her unremitting pain, unable to sustain any gainful employment, unable to perform routine household work, and unlikely ever to improve.  Had her surgery been performed properly, plaintiff could have been employed as a certified nurse's assistant until a normal retirement age of about 59.  The present value of her lost wages (up to the time of trial and in futuro), after taxes but without deducting Social Security contributions (because she will never recover Social Security), is $241,503.  The lost value of her services to her family is $329,927.

I find that plaintiff has not sustained her burden of proving by a preponderance of the evidence that there were breaches of the applicable standard of care in Walter Reed's pre-op planning, in the manner of the fusion of plaintiff's lumbar spine in the first Walter Reed operation, in the use of the

extra-cavitary approach in the first Walter Reed operation, in the severance of the L1 nerve root in the first Walter Reed operation, in the absence of records that show COBB measurements and sagittal balance measurements, or in the manner of bending the rods in the second Walter Reed operation.

**Conclusions of Law**

The plaintiffs' burden of proof is to establish the applicable standard of care, demonstrate that the standard has been violated, and develop a causal relationship between the violation and harm complained of.  Tarpeh-Doe v. United States, 28 F.3d 120, 123 (D.C. Cir. 1994).  The standard of care, in a medical malpractice case like this one, is that degree of reasonable care and skill expected of members in the medical profession under the same or similar circumstances, Esfandiari v. United States, 810 F. Supp. 1, 6-7 (D.D.C. 1992) (citing Morrison v. McNamara, 407 A.2d 555, 561 (D.C. 1979)), determined, under the Federal Tort Claims Act, "in accordance with the law of the place or the act of commission occurred," 28 U.S.C. § 1346(b), which in this case, was the District of Columbia.  See Hernandez v. United States, 636 F.2d 704, 706 n.5 (D.C. Cir. 1980).  In this case, plaintiff's evidence of the alleged breaches of the standard of care was presented by orthopedic surgeons, and the defendant's, by neurosurgeons, but neither side identified any differences between the standard of care applicable to spine

surgery by neurosurgeons, on the one hand, and by orthopedic surgeons, on the other, and the applicable standard of care is accordingly found to be that which applies to spine surgery.

Although the purpose of the 2002 Walter Reed surgery was to correct the patient's kyphosis and relieve pain, plaintiff's expert Dr. Kirk Wineke testified persuasively that the Walter Reed surgeon failed to identify the pain generator, even though his pre-op notes, Ptfs.' Ex. 24, indicated his awareness of the pseudo-arthrosis that had been diagnosed at Johns Hopkins.  It was his failure to identify and repair the pseudo-arthrosis that virtually guaranteed continual pain, because a pseudo-arthrosis -- a "false joint" -- moves, and nerves grow into and around it.

The government does not contend otherwise.  The Walter Reed surgeon conceded in his testimony that "my surgery failed," that his judgment call was incorrect, that he should have "taken down" the cage in the July 2002 surgery, and that the sequelae of the failed surgery, the "falling off" and the loss of lumbar lordosis, was consistent with the presence of pseudo-arthrosis and was likely the result of the failure of the implants and the failure of native bone.  The surgeon's defense was that this was a judgment call, not a breach of the standard of care, that he did not see movement in the cage, and that to him the lack of movement he said he observed meant that the haloing seen on x-

rays was not pseudo-arthrosis but "fibrous non-union." The question, then, comes down to whether the Walter Reed surgeon really made an informed judgment call that turned out to be incorrect (in which case, the standard of care was not breached), or whether, in fact, he did not adequately inspect and challenge the integrity of the titanium cage.

My conclusion, that the Walter Reed surgeon breached the standard of care by failing adequately to test the integrity of the fusion at both ends of the cage, does not turn on the credibility of witnesses, but rather on the weight of the evidence. On the plaintiffs' side is a surgeon who observed the cage after the second Walter Reed surgery and believed it impossible that the Walter Reed surgeon could have done what he said he did. That belief was supported by the expert testimony of Dr. Wineke. On the defense side there was nothing except the surgeon's testimony that he did what he said he had done -- testimony that was uncorroborated by contemporaneous notes and, most importantly, testimony (about his belief that there was solid fusion in July 2002) that was flatly inconsistent with the undisputed fact that there was no fusion at all in February 2003. The Walter Reed surgeon may indeed believe that he recalls making a "judgment call," but all the rest of the evidence in the case tends to disprove that belief or that recollection.

There is no dispute in the record about causation. The plaintiff experienced chronic and severe pain before she went to Walter Reed in the first place, but it was expected that surgery would relieve her pain, perhaps completely. What happened instead was that the second Walter Reed operation caused severe, disabling and intractable pain and made the Johns Hopkins "salvage" surgery necessary, and the combination of all these surgeries has left the plaintiff with her pain unrelieved and with no prospect for improvement for the rest of her life.

Plaintiff is entitled to recovery of non-medical economic losses for her lost past and future income, her lost homemaking services, and her extraordinary pain and suffering. Her husband, plaintiff John Hedrick is entitled to compensation for his loss of consortium.

\*   \*   \*

The Clerk is directed to enter judgment in favor of the plaintiffs and against the defendant. Judgment for the plaintiff Ok Kyong Hedrick will be in the amount $1,571,430. Judgment in favor of John Hedrick will be in the amount of $200,000. Plaintiffs will have recovery for their costs.

It is **SO ORDERED**.

JAMES ROBERTSON
United States District Judge